WILLIAM A. GILLESPIE *vs.* STATE OF MARYLAND.

HAROLD R. DICKEY, JR., *vs.* STATE OF MARY-LAND.

*Criminal Conspiracy—Indictment—Averment of Knowledge—Evidence—Cross-examination—Assumption in Question.*

The essence of the offense of criminal conspiracy consists in the unlawful agreement and combination of the parties; and therefore it is completed whenever such combination is formed, though no act be done towards carrying the main design into effect. p. 56

The law of conspiracy, as stated in the *Buchanan* case, is to be regarded as settled in this State. p. 59

An indictment charging a conspiracy to defraud the customers of a concern operating a blind pool, by the preparation and publication of a false report of its financial condition, was not defective because it failed to show that defendants knew of the falsity of the report at the time of publication, since when an act is in its nature unlawful, knowledge of its unlawful character is presumed. p. 61

An indictment charging conspiracy to commit an unlawful act by cheating and defrauding certain classes of persons, need not charge that defendants actually knew that the statement by which that object was to be accomplished was false. p. 61

An indictment for conspiracy to obtain the monies of the customers of a concern operating a "blind pool," by the publication of a false statement as to its financial condition, *held* not to be defective because it defined solvency in other than its technical meaning, the indictment as a whole showing that the object of the conspiracy was to induce customers to deposit money with the concern when it was unable to meet its obligations, and when its liabilities exceeded its assets, by fraudulent representations as to its financial condition. pp. 63, 64

The word "large," as used in a letter stating that a certain concern purchased and sold securities in large volume, was not too indefinite to be the basis of a conviction in a prosecution for conspiracy to defraud by the publication of such letter.

p. 64

A count in an indictment for conspiracy to defraud by a false statement as to the financial condition of a certain concern was not defective because it charged that the concern mingled its customers' money with its own beyond "hope" of identification, that it might be used as the exigencies of its business required, this amounting merely to a statement that the intention was to get the money of the customers into the hands of the concern.

pp. 64, 65

An indictment is not defective merely because it is not indorsed for the purpose of identification by the foreman of the grand jury, it being indorsed "true bill" by another member of the grand jury, who styled himself "assistant foreman," and by the State's Attorney, and it being filed with the clerk of the criminal court.

pp. 65-68

It being the usual and proper practice for grand juries to present their indictments in open court, it will be presumed on appeal, in the absence of a showing to the contrary, that this was done in a particular case.

p. 67

A question asked a witness on cross-examination, whether certain statements made by him were "facts" or "only some things that you learned from others," was properly excluded as assuming that things learned from others could not be facts.

p. 68

A question asked on cross-examination about matters not referred to in the examination in chief, as to which the witness could have had no actual knowledge, was properly excluded.

p. 68

On a prosecution for conspiracy in publishing a false statement as to the financial condition of another's business, a schedule filed by such other in connection with the appointment of a trustee for him as a voluntary bankrupt, which schedule was filed before the conception of the alleged conspiracy, was inadmissible to show the relations between such bankrupt and

defendant, it involving merely a statement by such other that he owed defendant money, and being consequently hearsay. p. 69

On a prosecution for conspiracy, evidence as to acts of the trustee in bankruptcy of one of the alleged conspirators, not connected with the alleged conspiracy, *held* not admissible against another alleged conspirator.                    p. 69

On a prosecution for conspiracy to defraud by publication of a false statement as to the financial condition of a concern operating a "blind pool," a newspaper clipping containing a challenge to the local operators of "blind pools" to have their books examined, *held* admissible, it appearing that all the alleged conspirators knew of this challenge, and arrangements for the making of the audit, on which the false statement was based, having been made after the publication of the challenge.
                                                     p. 69

*Decided December 4th, 1924.*

Appeals from the Criminal Court of Baltimore City (GOR-TER, C. J., CARROLL T. BOND, J. and STANTON, J.).

Criminal proceedings against William A. Gillespie and Harold R. Dickey, Jr. From a judgment of conviction and sentence, defendants separately appeal. Affirmed.

The causes were argued before BOYD, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and PARKE, JJ.

*Alexander Armstrong,* with whom were *Harry E. Karr, Samuel J. Fisher,* and *William Pepper Constable* on the brief, for the appellants.

*Eugene A. Edgett, Assistant State's Attorney,* and *Rowland K. Adams, Deputy State's Attorney,* with whom was *Herbert R. O'Conor, State's Attorney,* on the brief, for the State.

OFFUTT, J., delivered the opinion of the Court.

The appellants in these cases were tried and convicted by three judges in the Criminal Court of Baltimore City of a conspiracy to defraud existing and prospective customers of the Union Finance Company, "a common law trust," hereinafter called the trust. Judgment and sentence followed the verdict in each case, and from these judgments these appeals were taken.

Demurrers interposed to the indictment by each defendant were overruled by the court, and in the course of the trial eight exceptions were noted to the court's rulings on questions of evidence. Those rulings we are now asked to review.

Before considering the questions thus presented, we will refer to such of the facts of the case as are undisputed and to such facts as may for the purposes of this opinion be assumed, which we consider essential to an adequate understanding of the legal propositions we are called upon to consider.

For some years prior to the alleged conspiracy in this case public attention had been attracted to the activities of certain speculative investors in stocks and bonds throughout the country who operated what popularly came to be known as "blind pools." The plan under which these pools operated appeared to be this: Investors or depositors deposited with the operator of the pool money to be used by him in gambling on the stock market either on margin or by purchase outright of securities, and the profits or losses resulting from his operations were prorated among the investors or depositors in proportion to the amount of money they had invested or deposited.

The operations of these pools had become so extensive, and the public interest in them so acute, in the City of Baltimore in 1922, that an association of bankers and brokers of that city, known as the "blue sky committee," undertook an investigation of their operations, and as a result the members of the committee were led to doubt whether the earnings claimed by the "blind pool" operators could be shown to exist.

They consulted the Attorney General of the State to ascertain whether the operation of these pools violated any law of the State, and were told that it did not. They then approached the Baltimore News, a newspaper published in Baltimore City, and asked the managers of that newspaper to take the matter up and investigate it, which they agreed to do. From that time, about July 28th, 1922, to quote Mr. Locke, chief editorial writer of the News, "a series of articles casting suspicion upon the operation of the blind pools beginning on July 28th, I think, and continued practically every day for about a month and a half, following up through the receivership; that included the Griswold challenge, the opinions of prominent bankers etc. as to the feasibility of their claiming to do what they claimed to do, and that was supplemented by our own efforts to ascertain information as to how they transacted business and what their progress was."

On August 10th, 1922, the Baltimore News published an interview with Mr. B. Howell Griswold, a member of the banking firm of Alexander Brown & Sons, in which he challenged the "blind pool" operators to submit their books without cost to themselves to some firm of accountants, to be selected either by Judge John C. Rose of the United States Court or by the Governor of the State.

Among those affected by this campaign against "blind pools" was Emory M. Newton, who was jointly indicted with the appellants in these two appeals, and who operated the Union Finance Company, common law trust. That "company" is described in the indictment as a common law trust, but what its nature, powers and functions are does not appear from anything to be found in the record.

Whenever money was invested or deposited in the trust, a certificate was issued therefor which certified that

> "* * * has deposited $...... in an account opened and managed by The Union Finance Company for the purpose of buying and selling securities, listed on the New York Stock Exchange, and other stock exchanges, participation in syndicates, pools, etc. In

consideration of said management The Union Finance Company is to receive thirty per centum from this account and the said * * * to receive seventy per centum of monthly disbursements.

"It is also understood that the said * * * can withdraw all or any part of * * * account upon sixty days' written notice to The Union Finance Company. Said notice to be given on the first day of the calendar month, and that the amount of the withdrawal shall not participate in any profits from the date of said notice, and in the case of the death of the above depositor the amount entered on this certificate is at once due and payable to the heirs and assigns of said party."

Shortly after the publication of the Griswold challenge, Newton, on August 15th, 1922, engaged William A. Gillespie, a public accountant, to make an audit of the books of the trust to determine whether it was solvent and whether it did deal in securities. The actual work of the audit was under the supervision of Harold R. Dickey, Jr., who had been employed as an accountant by Gillespie on a salary since 1917.

Upon the conclusion of the audit on August 18th, 1922, Gillespie addressed a letter to the Union Finance Company, which contained the following statements:

"Pursuant to your instructions, we report we have made an audit of the books and accounts of your company from the date of beginning operations to August 15, 1922, and have found same to be correct.

"We find your company to be solvent and capable of meeting all obligations and contracts entered into with your clients.

"We further certify that your company purchases and sells listed securities in large volume, and your inventory of securities at the market at the close of business August 15, 1922, shows a substantial surplus over and above your obligations."

That letter was on August 19th published by the Union Finance Company as a paid advertisement in the Baltimore

News and the Evening Sun, and later in the morning papers.

Some time after that Mr. James Locke of the Baltimore News, as the result of information he had received concerning the audit, instructed Mr. Ucker, also connected with the same paper, to make some inquiries as to it. Later Mr. Gillespie, at his own request, had an interview with Mr. Locke, at which the solvency of the company was discussed, and at the same interview the valuation placed upon shares of the California Oil and Mining Corporation by Mr. Gillespie in the audit was questioned. That stock had been bought at twenty cents a share, but had been valued at fifty cents a share by Gillespie on the strength of an offer of the Prudential Securities Company made on or about August 16th, 1922, to buy it at that price. A few days later Gillespie, with Newton and Dickey, again visited Mr. Locke and discussed with him the statement in the letter referred to above, that the Union Finance Company bought and sold listed securities in large volume. Later Newton called on Locke and told him that some of the securities in which the trust traded had been bought on straight margin and others on the partial payment plan.

Subsequently Gillespie, Dickey and Newton were indicted for conspiracy to defraud the existing and prospective investors or customers of the Union Finance Company by inducing them to invest or deposit their money with it in the belief that it was solvent, able to meet its contracts and obligations, and that it dealt in securities in large volume, whereas it was insolvent, was not able to meet its contracts and obligations, and did not deal in securities in large volume. That indictment rested upon the theory that the valuation placed by Gillespie upon the stock of the California Oil and Mining Corporation and the Jockey Club Internationale of Mexico was false, and that the money which the company had paid as commissions to its solicitors had been improperly treated as an asset, and that, had the correct valuation been given these stocks, and the item of commis-

sion as an asset eliminated, the audit would have shown the company to be insolvent.

Whether the letter written by Gillespie was fraudulent depended mainly, first, upon whether his valuation of the oil stock and the jockey club stock was excessive; second, whether he was justified in treating money which the trust had paid out for commissions as an asset; third, whether the trust owed its depositors 100 per cent. of their deposits; and fourth, whether it dealt in listed securities in large volume. The oil stock and the jockey club stock were both unlisted,. and their values were fixed by Dickey and Gillespie, upon the basis of the cost price of the jockey club stock and of the price offered by the Prudential Securities Company for the oil stock. Their conduct in treating the commissions paid as an asset they justified by what they contended was the standard practice in accountancy. As to the statement that the trust dealt in listed securities in large volume, it did appear that it had bought on margin some stock, and that it had bought on the partial payment plan listed stocks costing over $300,000, although at the time the increased valuation was placed on the California oil stock all the listed stocks then held for it had declined in price. In addition to what has been stated, the account was criticised because the accountants had treated an item of $1,000 which could not be found among the assets of the company, as a debt due by its manager, and an item of $5,459.02 which Newton had personally received from the trust funds as an account receivable.

Turning now to the propositions presented by the appeals,. the first question with which we are called upon to deal is the propriety of the court's ruling on the demurrers to the indictment, and in connection with that question we will state what we understand to be the law of criminal conspiracy applicable to the question before us, as that law is established in this State.

In dealing with the subject of criminal conspiracy we must look for the law almost entirely to cases rather than to

statutes, since the only statutes which could materially affect any consideration of the subject, 20 Ed. 1, 28 Edw. 1 and 33 Edw. 1, relate only to a comparatively small part of the law on that subject as it is now established.

The law of criminal conspiracy as it is now understood and administered appears to have taken its rise from the proceedings of the Star Chamber, and is almost entirely the product of judicial decisions. Sir James Fitzjames Stephen, in his *History of the Criminal Law of England,* vol. 2, page 227, *et seq.,* says:

"Conspiracy has much analogy to an attempt to commit a crime. It consists in an agreement between two or more persons (as is commonly said) 'to do an unlawful act' or to 'do a lawful act by unlawful means.' In other words, it is an agreement to do anything unlawful, whether the thing agreed upon is in itself an ultimate object, or only a means to an end lawful or unlawful. The crime of conspiracy regarded as an inchoate offense calls for little observation, but it has a remarkable history. In very early times the word had a completely different meaning from that which we attach to it. * * *

"The earliest meaning of conspiracy was thus a combination to carry on legal proceedings in a vexatious or improper way, and the writ of conspiracy and the power given by the *Articuli super Chartas* to proceed without such a writ, were the forerunners of our modern actions for malicious prosecution. Originally, therefore, conspiracy was rather a particular kind of civil injury than a substantive crime, but like many other civil injuries, it was also punishable on indictment, at the suit of the king, and upon a conviction the offender was liable to an extremely severe punishment which was called 'the villain judgment.' The Star Chamber first treated conspiracies to commit crimes, or, indeed, to do anything unlawful as substantive offences, and after the Restoration, this, amongst other doctrines of theirs found its way into the Court of King's Bench. The doctrine was expressed so widely or loosely that it became in course of time a head of

law of great importance, and capable of almost indefinite
extension. In various cases the definition that a conspiracy
is an agreement to do an unlawful act was held to mean some-
thing more than an agreement to do an act which is in itself
criminal when done by a single person, the word 'unlawful'
being used in a sense closely approaching to immoral simply,
and amounting at least to immoral and at the same time in-
jurious to the public."

In *Holdsworth's History of English Law,* vol. 5, p. 203,
referring to the same subject, the author says:

"But we have seen that, historically, conspiracy is more
closely connected with offences against the administration
of justice; and that it was almost exclusively from this point
of view that it was treated by the mediaeval common law.
The modern law on this subject really springs from these
two diverse yet connected roots. Hudson could class together
conspiracy and false accusation. But when he was writing
this classification was ceasing to have the meaning which it
once possessed, because conspiracies which had no reference
to false accusations were being punished by the Star Cham-
ber.

"The Star Chamber assumed jurisdiction over all cases of
conspiracy. Though Coke once maintained that a person ac-
quitted on a criminal indictment must proceed, not by bill
in the Star Chamber but by the criminal procedure of the
common law, Lord Ellesmere maintained that in this case as
in all others the Star Chamber had jurisdiction; and his view
prevailed. Moreover the Star Chamber punished false and
malicious accusations made before itself or before the court
of chancery and it punished criminally conspiracies which
would only have been the ground for an action upon the case
at common law. Further, it adopted the common-law rule
applicable to actions on the case for conspiracy, and punished
a single accuser who had falsely and maliciously taken such
proceedings.

"But it is clear that under these circumstances the element
of conspiracy will tend to evaporate. The gist of the offense

will be rather the malicious attempt to ruin another by a false charge than the conspiracy to effect this result: It was inevitable, therefore, as Stephen has said, that conspiracy should come to be regarded as a form of attempt to commit a wrong. It was so regarded in the sentence given in the Star Chamber against those who attempted to fight duels; and in the *Poulterers' Case* it was ruled in the Star Chamber that the mere conspiracy, though nothing was executed, was an offense. But, if a conspiracy is so regarded, why restrict it to conspiracies to commit some offense in relation to legal proceedings? The Star Chamber acted upon this view; and, just as it punished all kinds of attempts to commit wrongful acts, so, *a fortiori,* it punished all kinds of conspiracies to commit the many varied offenses punishable either by it or by the common law courts. When the Star Chamber was abolished, the two divergent streams of doctrine which resulted from the mediaeval precedents and the rules evolved in the Star Chamber, produced some very complex developments in the law of crime and tort."

The leading case in this State on the subject is *State v. Buchanan,* 5 H. & J. 317, decided by this Court in 1821. In that case certain defendants were indicted for a conspiracy to defraud the Bank of the United States and, in disposing of a demurrer filed to the indictment in that case, this Court, in an opinion in which there was a very exhaustive and elaborate review and discussion of the cases and the principles relating to the question, stated this to be the clearly settled law in this State:

"1st. That the offense of conspiracy is of common law origin, and not restricted or abridged by the Statute 33 Edward 1.

"2nd. That a conspiracy to do any act that is criminal *per se,* is an indictable offense at common law.

"3rd. That an indictment will lie at common law: 1st. For a conspiracy to do an act not illegal, nor punishable if done by an individual, but immoral only. 2nd. For a conspiracy to do an act neither illegal nor immoral in an indi-

vidual, but to effect a purpose, which has a tendency to prejudice the public. 3rd. For a conspiracy to extort money from another, or to injure his reputation by means not indictable if practiced by an individual, as by verbal defamation, and that, whether it be to charge him with an indictable offense or not. 4th. For a conspiracy to cheat and defraud a third person, accomplished by means of an act which would not in law amount to an indictable cheat, if effected by an individual. 5th. For a malicious conspiracy, to impoverish or ruin a third person in his trade or profession. 6th. For a conspiracy to defraud a third person by means of an act not *per se* unlawful, and though no person be thereby injured. 7th. For a bare conspiracy to cheat or defraud a third person, though the means of effecting it should not be determined on at the time. 8th. That a conspiracy is a substantive offense and punishable at common law, though nothing be done in execution of it. And 9th. That in a prosecution for a conspiracy it is sufficient to state in the indictment the conspiracy and the object of it, and that the means by which it was intended to be accomplished need not be set out, being only matters of evidence to prove the charge, and not the crime itself, and may be perfectly indifferent.

"From all which it results that every conspiracy to do an unlawful act, or to do a lawful act for an illegal, fraudulent, malicious or corrupt purpose, or for a purpose which has a tendency to prejudice the public in general, is at common law an indictable offense, though nothing be done in execution of it, and no matter by what means the conspiracy was intended to be effected; which may be perfectly indifferent, and makes no ingredient of the crime, and, therefore, needs not be stated in the indictment."

After that decision the first case in which the principles involved in the question before us were discussed was *Blum v. State,* 94 Md. 376, decided in 1902, and in that case the court, referring to the sufficiency of the indictment filed in it, said:

"No demurrer having been interposed to the indictment, we would not be warranted in reviewing it here, but we deem it proper to say in order to avoid the creation of any doubt upon the question, that we regard the sufficiency of this indictment as established by the decision in *State v. Buchanan,* 5 H. & J. 317, where all the authorities were elaborately reviewed. No decisions in this State are more highly regarded than those rendered by Chief Justice Buchanan, and we think his opinion in that case is sustained by the weight of authority." Later, in *Lanasa v. State* 109 Md. 607, criminal conspiracy was again defined in somewhat different language in an opinion filed by Judge Burke, in which this Court again approved the Buchanan case, saying: "Upon the settled law of this State, and upon the authority of well-reasoned cases in other jurisdictions, we cannot agree that the count assailed is in any respect defective, or that the judgment should be arrested. A conspiracy may be described in general terms, as a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose; or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means. It is not essential that the act intended to be done should be punishable by indictment. The essence of the offense consists in the unlawful agreement and combination of the parties; and, therefore, it is completed whenever such combination is formed, although no act be done towards carrying the main design into effect. 3 *Greenleaf on Evidence,* 2nd Ed., secs. 89-91. It may be said that this statement of the law by Mr. Greenleaf announces the almost universally accepted doctrine upon the subject of criminal conspiracy. This is made perfectly apparent by the numerous citations from text books and reports contained in the briefs filed in this case. It is the rule which has obtained in this State since the great case of the *State v. Buchanan,* 5 H. & J. 317, in which will be found a collection of many cases in which an unexecuted conspiracy to commit acts not in themselves indictable offenses was held to be a criminal conspiracy." In

*Garland v. State,* 112 Md. 90, after again approving the
statement of the law of criminal conspiracy in the Buchanan
case, the Court quoted with approval a passage from 8 Cyc.
664, which to an extent supplemented that statement but in
no sense qualified it. The passage referred to is this: "In
charging the intended offense, the indictment need only be
certain to a common intent. The crime intended to be ac-
complished by the conspiracy need not be described in the
indictment with the accuracy or detail which would be essen-
tial to an indictment for the commission of the offense itself,
but need only be designated as it is known to the common law
or defined by statute. Allegations of acts which if commit-
ted would have constituted the crime are not required; but
where the intended offense has no designation at common
law, or having a designation the indictment does not so refer
to it, but attempts to state its ingredients, they must be stated
as fully as if the indictment were for the commission of the
offense itself. If the purpose of the conspiracy be the doing
of an act which is not an offense at common law, but only by
statute, such purpose must be set forth in such a manner as to
show that it is within the terms of the statute." In *Archer
v. State,* 145 Md. 144, in further reference to the same sub-
ject this Court, through Judge Adkins, said:

"(a) 'The indictment must show that the conspiracy was
to defraud some person or some class of persons. It is not
necessary that there be a definite person or number of persons,
if it is shown that some one was to be defrauded. An alle-
gation showing a conspiracy to defraud the general public
or a particular class is sufficient.' 5 *R. C. L.* 1083. 'Where
the conspiracy is directed against a particular person or the
object of the conspiracy has been effected so that the person
or persons intended can be ascertained, he or they should be
designated by name, or the reason why such designation is
not made should be stated; but where no intent as to any
particular person was formed it should charge an intended
wrong against some person, persons or class of persons or the
general public. This, however, will be sufficient without des-

ignating any particular individual.'  12 *Corpus Juris,* 617.
* * * In a conspiracy of the kind charged in this case it
could not be known by the alleged conspirator on whom it
would operate; and the then customers of traversers and
those who might be induced to become such, were properly
treated as a class.  The Maryland cases cited by appellant
deal with an entirely different class of cases.

"(b) 'In a prosecution for a conspiracy it is sufficient to
state in the indictment the conspiracy and the object of it;
and the means by which it was intended to be accomplished
need not be set out, being only matters of evidence to prove
the charge and not the crime itself.'  *State v. Buchanan,* 5
H. & J. 317."

And that conclusion was approved in the case of *Lockhart ·
v. State,* 145 Md. 602.

Now, whether the law of criminal conspiracy as it has been
stated and defined in this State took its rise from the three
Ordinances against Conspirators of Edward I; whether it
grew out of the efforts of the Court of Star Chamber to reach
and punish offenses deemed prejudicial to the public interest
but which had not theretofore been regarded as crimes, or
whether it originated in the vague and undefined body of
customs, rules and precedents known as the common law, is
a matter of purely academic and historical interest, which
could not possibly affect our consideration of the question
here involved.  Nor does it matter that the law of criminal
conspiracy may have been differently stated in other juris-
dictions, because whatever may have been its origin and what-
ever may be the law elsewhere, in the absence of any statute
we are bound to recognize and apply the law as it has been
defined and interpreted by this Court.

It has been argued with great force and ability that the
Buchanan case goes too far and that its statement of the law
is too broad and unsound and in conflict with the best con-
sidered authority elsewhere, and should be repudiated.  With-
out pausing to comment on the justness of that criticism, it is
sufficient to say that the law as stated in that case has been

regarded as the settled law of this State for more than one hundred years, and during that long period has been repeatedly approved by this Court, and for us now to set aside rules of law so long settled and established would be a wholly indefensible exercise of judicial power.

Returning now to the indictment, the appellants attacked it, first, on the ground that it is bad in law and insufficient in substance, and second, because, they say, it was not properly authenticated or identified, and these objections will be considered in their order.

The indictment contains three counts. The first count charges that Emory M. Newton, sole trustee of the Union Finance Company, a Common Law Trust, engaged in buying and selling securities, participating in syndicates and in underwriting securities of all kinds, William A. Gillespie, a public accountant, and Harold R. Dickey, the younger, in the employ of Gillespie, "wickedly devising, contriving and intending knowingly, corruptly and unlawfully to cheat and impoverish the then customers and such other persons as might become customers of the said Union Finance Company, Common Law Trust, as aforesaid, and to defraud the then customers of the said Union Finance Company, Common Law Trust, as aforesaid, of their moneys and properties," did on August 17th, 1922, "wickedly, falsely, fraudulently and unlawfully conspire, combine, confederate and agree together and with each other, to cheat and defraud the then customers of the said Union Finance Company, Common Law Trust, as aforesaid, and such other persons as might become customers of the said Union Finance Company, Common Law Trust, as aforesaid, by preparing and causing to be prepared and by causing to be published, circulated and printed in certain newspapers of Baltimore City, to wit, the Baltimore News and the Evening Sun, as and of the nineteenth day of August, in the year of our Lord nineteen hundred and twenty-two, certain false, fraudulent and incorrect report of the financial condition and business practices of the said Union Finance Company, Common Law Trust," with

intent to cheat and defraud "the then customers of the said Union Finance Company, Common Law Trust, as aforesaid, and such other persons as might become customers of the said Union Finance Company, Common Law Trust, as aforesaid, of certain moneys and properties of the said then customers of the said Union Finance Company, Common Law Trust, as aforesaid, and such other persons as might become customers of the said Union Finance Company, Common Law Trust, as aforesaid." The second count differs from the first in characterizing the letter or report as a false pretense. It is argued that these counts are bad since they fail to show that the several defendants knew when it was published that the report was false. But where "an act is in its nature unlawful, knowledge of its wrongful character is presumed, and it is unnecessary to allege in an indictment that the defendants had knowledge of its wrongful character." And "unlawful" as used in that definition does not necessarily mean "criminal," but may include a breach of civil as well as criminal law. *Words and Phrases (Second Series)*, page 1079.

The object of the conspiracy charged in these two counts was to cheat and defraud certain classes of persons. To cheat and defraud an individual may not be a criminal act, yet to cheat and defraud the public is an indictable offense at common law, and while under some circumstances to cheat and defraud may not be a crime under the circumstances of this case, it is certainly, within the meaning of the definition last referred to, unlawful. And since the accused were charged with conspiring to commit an unlawful act, it was not necessary to charge that they actually knew that the statement by which that object was to be accomplished was false. For, as stated in *Wharton on Criminal Procedure* (10th Ed.), par. 517: "A conspiracy being unlawful, and every citizen being presumed to know the law, it is unnecessary in an indictment or information charging conspiracy to allege knowledge on the part of the accused of the wrongful character of the act of conspiring and combining; when the combination and the object to be accomplished thereby are alike lawful, but the

end is to be attained by unlawful means, it is unnecessary to allege that the accused knew the means to be used to be criminal, because where an act is in its characteristics and quality wrongful knowledge of its wrongful character is presumed and need not, therefore, be alleged, except in those cases where the act becomes wrongful and criminal by reason of the presence of accidental or fortuitous features not necessarily attendant upon it, in which case knowledge must be alleged."

Without further prolonging the discussion of the demurrers to these two counts it is sufficient to say that in our opinion they were properly overruled.

Stated in its lowest terms the third count charges (1) that the defendants knew that the trust did not purchase and sell listed securities in large volume; (2) that they knew it was insolvent in the sense that its tangible assets were insufficient to cover its liabilities to its customers, and (3) that they knew that because of that condition it was unable to fulfill its contract obligations, which it assumed whenever it received money from its customers, which obligations were always to keep in its possession or control "moneys and securities sufficient in kind and amount to cover all liabilities owing" by it to its customers in the aggregate, (4) and that with that knowledge fraudulently and unlawfully designing by certain false pretences to get into the hands and possession of the trust the moneys and property of its customers existing and prospective, (5) they did wrongfully, fraudulently and unlawfully conspire, confederate and agree together to obtain by such false pretence (the publication of the report referred to above) such moneys and property with the intent that said moneys should be placed in and commingled beyond all hope of identification with the general funds of the trust which was insolvent in the sense that its tangible assets were insufficient to cover its liabilities to its customers, and used as the exigencies of its business might require.

The principal objections urged against this count are: (1) that in the statement that the company bought and

sold listed securities in "large" volume the word "large" is too indefinite to form the basis of "conviction in a criminal case," and (2) that the definition of solvency in the count is incorrect, (3) and that it improperly charged the defendants with the duties and obligations of brokers, whereas the business conducted by Newton was a "blind pool."

This count differs materially from the first two counts, which are based upon an intention to cheat and defraud, whereas the object of the conspiracy charged in this count was to obtain the moneys of the trust's customers that they might be mingled beyond identification with the moneys of the trust and used in its business. Since that may have been the very purpose for which the trust's customers deposited money with it, and since there is nothing to show that it undertook to keep the money of each customer in a separate fund, such an object was not necessarily unlawful, although it may have been highly injurious to the customers of the trust if, at the time such deposits were made, the trust was insolvent, or so situated that its customers were in danger of losing their deposits.

It is assumed in the count that the word "insolvent" as used in it means that the tangible assets of the trust were insufficient in the aggregate to cover liabilities in the aggregate of the trust to its customers.

In characterizing the conspiracy, the important thing to consider is not the technical definition of insolvency, but the financial condition of the trust at the time it was consummated. Solvency is by the language of the count given a special meaning different from its technical meaning. If we give to "solvent" its technical meaning and separate it from the context it might be possible for a person to be wholly solvent, as stated in the letter, and yet be insolvent as that word is defined in this count, and the charge of insolvency contained in the count would not then necessarily be inconsistent with the truth of the statement in the letter that the trust was solvent. But when the futher averments of the count are considered they are sufficient to charge insolvency

in a narrower sense, for they charge that because of its in-
solvency, in the sense in which that word is employed in the
count, the trust was unable to fulfill its obligations to its
customers, to wit, to keep in its possession or control suffi-
cient assets to cover all liabilities to its customers. And in
that connection it is to be noted that the letter did more than
merely state that the trust was solvent; it stated that it was
capable of meeting all obligations and contracts made with its
clients, and that its inventory showed a substantial surplus
over and above its obligations, although the demurrer admits
that the defendants knew those statements to be false when
made.

From all these averments, therefore, it appears that the
object of the conspiracy was to induce customers and such
persons as might become customers of the trust to deposit
money with it at a time when it was unable to meet its obli-
gations, and when its liabilities exceeded its assets, by means
of false and fraudulent representations as to its financial
condition. That such an agreement was an indictable con-
spiracy we do not doubt, nor do we consider that the appel-
lants were injured by the definition of insolvency contained
in the count, or that it was vitiated thereby.

Nor are we inclined to give any weight to the objection
that the word "large" as used in the letter was too indefinite
to be the basis of a conviction in a criminal case. It was
definite enough to be used for the purpose of misleading and
deceiving the public, and indefinite or not, it was known to
be false, if we believe, as under the demurrer we must, the
language of the indictment, and, therefore, it must have been
definite enough to require those using it to accept responsi-
bility for its use in connection with the purpose it was de-
signed to accomplish.

It is further objected that the count is misleading because
it charges that the trust mingled its customers' money with
its own beyond "hope" of identification that it might be used
as the exigencies of its business required. It is true that for
aught that appears to the contrary in the indictment there

was nothing wrong or sinister in that if the concern was sol-
vent, or even if it were insolvent and the depositors knew
that fact, but when it is considered that it was insolvent and
unable to meet its obligations and that its assets were insuffi-
cient to cover its liabilities, and that the object of the con-
spiracy was to induce persons to deposit money with it by
deceiving them as to its financial condition, it is impossible
to see how the appellants could have been injured by that
averment, because it at most amounts to no more than saying
that the intent of the conspiracy was to get the money of the
depositors into the hands of the trust. As to the third ob-
jection it is sufficient to say that the indictment does not
charge that the trust was either a broker or a "blind pool."

The final objection to the indictment is that it was not
properly identified or authenticated, because it was not en-
dorsed by the foreman of the grand jury that returned it,
but by the assistant foreman, who was also a member of that
grand jury.

Assuming that this objection is properly before us, we have
no difficulty in sustaining the indictment. It is true that the
universal practice in this State for time out of mind has
been for the foreman of a grand jury returning an indict-
ment to sign his name under the words "true bill" on the
indictment, but his failure to do that is not necessarily fatal.
The purpose and reason for the endorsement and signature
is to identify the indictment and to attest the fact that it is
the act of the grand jury, and if those facts appear from any
other satisfactory source it is enough. While there are de-
cisions to the contrary, we believe this to be the conclusion
supported by the decided weight of authority, and in accord-
ance with the common law practice. In *Joyce on Indict-
ments,* par. 445, it is said: "It is said in an early case in
North Carolina that neither a presentment of a grand jury
nor an indictment requires necessarily that it should be
signed by any one. And it may be stated as a general rule
that, although it is the practice for the foreman to sign his

name to the finding of the grand jury, yet, in the absence of a statute to the contrary, such signature is not essential. And in a late case in Georgia it is said that there is no positive law requiring that the foreman of the grand jury shall sign the finding of true bill at all. It was not required at common law." And to the same effect, in 31 *C. J.* 618, it is stated: "By the weight of authority, in the absence of a statute, it is not necessary that an indictment or presentment shall be signed either by all the grand jurors or by the foreman."

In *Barlow v. State,* 127 Ga. 58, there is a very full and interesting review of the history of the practice and the decisions affecting it, and in referring to it the Supreme Court of Georgia (Lumpkin, J.) said:

"Under the English practice, where it was desired to have the grand jury act upon an indictment, a draft of it, termed a 'bill,' was engrossed on parchment and laid before the grand jurors. They examined witnesses in reference to its allegations, and, if they found them true, and so declared, it became an indictment. The bill had to be found true by a majority of the jurors, which majority had to consist of at least twelve. In *Archbold's Crim. Pl. & Pr.* (3rd Ed.) 102, it is said: "The finding must be indorsed on the indictment, and is 'parcel of the indictment and the perfection of it,' and 'touches it principally, for it is the life of it.' *R. v. Ford,* Yelv. 99. And the bill as found must be delivered in open court (*R. v. Thompson,* 1 Cox, 268), and it should be signed by the foreman; but absence of the signature is not fatal if the bill was delivered by the foreman in open court and read in his presence (*R. v. Sidoli,* 1 Lewin, 55).' 4 *Bd. Com.* 305. The action of the grand jury was indicated by the indorsement 'a true bill,' or 'ignoramus,' or, at a later date, instead of the latter, 'not found,' and all the bills so acted on were returned by the grand jury to the court. In this way the indorsement became the evidence of their action. * * * In *Frisbie v. United States,* 157 U. S. 163, it is said: 'But in this country the common practice is for the grand jury to investigate any al-

leged crime, no matter how or by whom suggested to them, and, after determining that the evidence is sufficient to justify putting the party suspected on trial, to direct the preparation of the formal charge or indictment. Thus they return into court only those accusations which they have approved, and the fact that they thus return them into court is evidence of such approval, and the formal endorsement loses its essential character.' Accordingly it was held in that case that 'the omission of the formal endorsement of an indictment as "a true bill," signed by the foreman of the grand jury, is not necessarily, and under all circumstances, fatal, although it is advisable that the indictment should be endorsed.' See also *State v. Magrath,* 44 N. J. Law, 227, 228; *Price v. Commonwealth,* 21 Grat. (Va.) 846, 856; *Commonwealth v. Smyth,* 11 Cush. (Mass.) 473, 474.

"In *Bishop's Criminal Procedure* (4th Ed.), par. 700, it is said: 'In the absence of a mandatory statute the doctrine best sustained by reason and authority is that the words "a true bill" and the signature of the foreman may be dispensed with if the fact of the jury's finding appears in any other form in the record.' "

See also *State v. Mace,* 86 N. C. 668; *McAllister v. State,* 2 Ga. App. 656, 58 S. E. 1110; *State v. Hill,* 48 W. Va. 132; *Price v. Commonwealth,* 21 Grat. (Va.) 846.

In this State the usual and proper practice is for grand juries to present their indictments in open court, and we will, in the absence of any showing to the contrary, assume that that was done in this case. And from the record it affirmatively appears that upon the back of the indictment the words "true bill" were written, and that under those words appeared the name of J. Triplett Haxall, "Assistant Foreman"; that it was signed by the State's Attorney for the City of Baltimore, and that it was filed with the clerk of the Criminal Court of Baltimore City. These facts were in our opinion sufficient to identify the indictment as the act of the grand jury, and the fact that it was not signed by the foreman does not under such circumstances destroy its validity. In passing upon this question we have assumed that Mr.

Haxall signed merely as a member of the grand jury, for our attention has been called to no statute or authority permitting an "assistant foreman" to exercise the functions of a foreman of the grand jury of Baltimore City, although under the Baltimore City Charter a member of the grand jury may be appointed to act in certain emergencies in the place of one originally designated, but who is for some reason unable to act.

For the reasons stated the demurrers to the indictment were in our opinion properly overruled.

The first exception found in the record relates to the action of the court in refusing to permit the defendants to cross-examine Mr. George Moore Brady on the nature and character of the business of the California Oil and Mining Corporation. The witness had not been examined upon that subject in chief, and we find no error in that ruling.

The second exception is more substantial. Mr. Brady had testified at length to the financial obligations of the Prudential Securities Corporation, which had offered to buy the oil company's stock from the trust at fifty cents a share, of its relations with Newton and the oil company, for the apparent purpose of showing that the securities company was not in a position to make good its offer of fifty cents a share for the oil stock, and so to reflect upon the good faith of that offer. Upon cross-examination he was asked: "Now, are they facts that you told Mr. Leach yesterday about it or are they only some things that you learned from others about the corporation?" and upon objection the court refused to allow the question. The form of that question was bad. It assumed that because the witness had learned from others certain things about the corporation that such things could not for that reason be facts. But while hearsay may have been inadmissible to prove such facts it did not, because it was hearsay, destroy their existence. The same witness was asked further on cross-examination about matters not referred to in the examination in chief as to which he could have had no actual knowledge, and we find no error in the

ruling of the court sustaining an objection to that question, which ruling is the subject of the third exception.

Hiram J. Weiskopf testified that he had been appointed a trustee for Emory J. Newton, a voluntary bankrupt, on June 23rd, 1922, and he then produced a schedule prepared by Newton and filed in the bankruptcy proceeding, in which Newton was listed as a debtor of Gillespie for about $8,000, and that schedule was offered in evidence and admitted over the objection of both of the appellants, and that ruling is the subject of the fourth exception. At the time the schedule was filed the alleged conspiracy had not been conceived, and it is not contended that it was in furtherance of it. It amounted, therefore, at most to a statement by Newton that he owed Gillespie money, and its only relevancy was to show the relations between Newton and Gillespie, and to show Newton's financial condition prior to the publication of the letter referred to above, and was clearly admissible against Newton, but as against the appellants in this case it was hearsay and inadmissible, but the appellants were not injured by the ruling, because substantially the same testimony came in later without objection.

After the schedule had been filed the witness was asked: "What assets did you collect when representing this estate?" and he was permitted over objection to answer that question, and that ruling is the subject of the fifth exception. No reason for the admission of this testimony is suggested by the appellee, and none has occurred to us, and in our opinion the objection to it should have been sustained. Whilst the fact that Newton was a bankrupt was relevant, the acts of his trustee in dealing with the bankrupt estate certainly were not, when they were in no wise connected with the alleged conspiracy, but we cannot see how the ruling injured the defendants.

The sixth exception relates to the action of the court in permitting the introduction in evidence of a newspaper clipping containing the so-called Griswold challenge. Since it appeared from evidence in the case that both the appellants

and Newton knew of this article, and that Newton had employed them to make the audit after it appeared, we find no error in this ruling. The seventh exception relates to the action of the court in admitting in evidence a booklet issued by the trust after the audit, stating that its books had been audited by Gillespie & Co. We find no error in this ruling. Nor can we find any reversible error in the ruling involved in the eighth exception. The court, it is true, permitted a witness to continue narrating what was apparently hearsay, but what he said could not have possibly injured the traversers.

For the reasons stated, the judgment appealed from will be affirmed, but we feel that in thus disposing of this case some reference should be made to the case of *Newton v. State,* which has also been decided at the present term of this Court. We are compelled, for the reasons stated in the opinion filed therein, to reverse the judgment in that case and to remand it for a new trial. As a result of our action in these cases, Gillespie and Dickey, who were mere employees of Newton, stand convicted of a criminal conspiracy of which Newton may possibly be acquitted, although the crime charged in the indictment in these cases could not have been committed unless Newton participated in it. Unfortunate as such a result may be, it is unavoidable. Such injustice, if any, as may result from it must be prevented or corrected by some other tribunal than this or by some other branch of the State government, since our sole function in criminal cases is to deal in each case with such matters of law as are presented by the record in such case, and to dispose of each case in accordance with our views of the law involved in the rulings of the lower court made in it, wholly uninfluenced by the facts or the disposition of any other case.

For the reasons stated the judgments appealed from will be affirmed.

*Judgments affirmed, with costs.*