## CUMMINGS *v.* STATE

[No. 99, September Term, 1960.]

*Decided December 13, 1960.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Fred E. Weisgal,* with whom were *Weisgal & Sollins* on the brief, for the appellant.

*Robert C. Murphy, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, Saul A. Harris, State's Attorney for Baltimore City,* and *Julius A. Romano* and *John W. Sause, Jr., Assistant State's Attorneys,* on the brief, for the appellee.

PRESCOTT, J., delivered the opinion of the Court.

The appellant was found guilty of murder in the first degree by two judges in the Criminal Court of Baltimore, and sentenced to life imprisonment in the Maryland Penitentiary. After his motion for a new trial was denied by the Supreme Bench of Baltimore City, he appealed.

There is no necessity for any extended or elaborate discussion, in this opinion, as to the divisions of homicide in Maryland. The sole question raised by the appellant is a claim that the evidence produced at his trial below was insufficient to support a finding of a "wilful, deliberate and premeditated killing" upon his part, so as to constitute first degree murder under the Code (1957), Article 27, Section 407. He con-

cedes that the evidence was sufficient to support a conviction of murder in the second degree, but argues that the State failed to show that the homicide was wilful, deliberate and premeditated, as it must do, to raise the offense to first degree murder.

The testimony need not be set forth at undue length; it was sufficient to support a finding of the following facts:

The appellant, a father of five children, and the deceased lived with their respective spouses in the city of Chicago, and had known each other for a number of years. An intimate, clandestine relationship between them had developed. They were in the habit of taking extended automobile trips together, especially over weekends and during vacations. The appellant testified he loved her.

On July 28, 1959, the deceased left Chicago with her sister, and drove by automobile to the home of relatives in the Cherry Hill area of Baltimore. The appellant had expected that he and the deceased would make the trip together, by themselves. Early on the morning after her departure, the appellant followed, alone, in his car. He drove all day and part of the night. At 11:00 P.M., he called the deceased and talked to her over the telephone. Later that night, he finally reached Baltimore, and spent the remainder thereof asleep on the front seat of his car.

In accordance with arrangements made when they had talked over the phone, appellant and deceased met early the following morning at the Cherry Hill Shopping Center. She had promised to have breakfast with him, but when she arrived, she stated that this would be impossible, as she had arranged to take some children on a picnic. However, if he would eat breakfast alone, she would meet him later in the day. He was naturally disappointed. Thereafter, he waited a long time for her. "It was hot. * * * There wasn't any shade. It was miserable. * * * I [the appellant] was disturbed. I was tired."

The deceased finally reappeared shortly before 12:30 P.M., driving a station wagon, which she parked near the appellant's Cadillac. She was accompanied by Marjorie Shelter, aged 20, and a nephew, aged 10. She went to his car, and was in

a "bad mood." He told her he was tired and hot, and felt sick. "It looked like I couldn't hardly bear it." A "heated" argument ensued during which she told him she was late for the picnic, and did not have time to take him to, or to show him, any place where he could stay or rest. The appellant threatened to return to Chicago, and requested the victim to give him directions. She replied that she did not want him to leave; that if he did so, he would do it on his own; and he would have to request the police for directions. He told her: "If that is the way you feel, I am finished."

While this conversation was taking place between the appellant and deceased, witnesses saw the deceased return to her station wagon and start the engine. The appellant called to her, and she returned to his car. She seemed to be angry at the appellant, and started to return to her automobile. She got a few feet from him, when the appellant took a pistol, which he had on the front seat of his car beside him, and shot her in the back through the open window of his automobile. He then opened the door, walked around it, and shot her six times more, apparently emptying the pistol without missing a single time.[1]

Officer Freeman of the Police Department had been standing about 110 feet from the scene of the shooting, and was an eye witness thereof. He immediately ran to the scene. The appellant dropped the gun on the victim's body; he offered no resistance; did not seem nervous nor angry; but was "perfectly passive" about the whole thing. In response to an inquiry as to why he had done the shooting, he replied: "I might go to jail, but I am glad I done it. * * * It is a lot of things, man. It is a lot of things."

When reviewing the conclusion reached by a trial court, sitting without a jury, in a criminal case, it is not our function to determine whether we are convinced of the accused's guilt beyond a reasonable doubt; our task is to determine whether the evidence produced and the proper and rational inferences from that evidence were of such a nature and char-

---

1. Medical evidence established cause of death as hemorrhage from multiple gunshot wounds and transection of the spinal cord.

acter that the trial court could fairly be convinced beyond a reasonable doubt of guilt, and the findings of fact of the trial court will not be set aside, unless clearly erroneous. Maryland Rule 741 (c); *Basoff v. State*, 208 Md. 643, 119 A. 2d 917; *Cooper v. State*, 220 Md. 183, 152 A. 2d 120.

We think the evidence, as set forth above, is clearly sufficient to support the finding of guilty of murder in the first degree. In *Chisley v. State*, 202 Md. 87, 106, 95 A. 2d 577, the Court quoted from *Hochheimer, Criminal Law* (2nd Ed.), Section 347, and said that "wilful," when used in a murder indictment, means there must be a specific purpose and design to kill; "deliberate" means there must be full and conscious knowledge of the purpose to do so; "premeditated" means the design must have preceded the killing by an appreciable length of time, time enough to deliberate; and, in order to justify a conviction of murder in the first degree, the trier of facts must find the actual intent, the fully formed purpose to kill with enough time for deliberation and premeditation to convince the trier of facts that this purpose is not the immediate offspring of rashness and impetuous temper, but that the mind has become fully conscious of its own design. The Court then cited several New York cases and pointed out that although the design to kill must precede the killing by some appreciable length of time, that time need not be long. If the killing be not the instant effect of impulse, if there be hesitation or doubt to be overcome, a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder. Practically the same language was used in the later case of *Faulcon v. State*, 211 Md. 249, 257-258, 126 A. 2d 858, wherein it was stated that the existence of the elements of wilfulness, deliberation and premeditation must be determined on the facts of each particular case.

It does not require any extended or elaborate discussion to show that the trial judges were justified in finding that the appellant had "a specific purpose and design to kill," and that he had a "full and conscious knowledge of his purpose to do so," when it was shown, and admitted, that he shot the de-

ceased seven times with a deadly weapon at point-blank range, and then, calmly, laid the pistol on her dead body, stating: "I might go to jail, but I am glad I done it." To elaborate upon something that is obvious is futile. The fact that the gun was available on the front seat beside him was one that the judges were entitled to consider and weigh. Whether he had contemplated, for some time, bodily harm to the deceased is a subjective matter not brought out in the evidence. (He claimed that it was his custom to carry the gun with him when on trips.) In any event, the judges may well have inferred that the appellant had fully formed his purpose to kill the deceased when he called her back to his car, and decided there was sufficient time between then and when he fired the shots to convince them that his actions were not "the immediate offspring of rashness and impetuous temper." Or they may have decided he formed his intent to kill shortly before he discharged the first shot, and concluded that there was enough time for reflection and decision between then and when he fired the last one and laid the gun on her body, so as to constitute premeditation as that term is used in a murder indictment. In either event, the evidence is, we think, sufficient to support their finding. See *Chisley v. State, supra,* [appellant shot the deceased twice with a short interval between shots]; *Grammer v. State,* 203 Md. 200, 225, 100 A. 2d 257, [appellant saw a piece of pipe on the ground, got out of his car, picked it up, returned to the car and killed the deceased with the pipe]; *Kier v. State,* 216 Md. 513, 523, 140 A. 2d 896, [protracted period, during which assault continued]; *Elliott v. State,* 215 Md. 152, 160, 137 A. 2d 130, [appellant, with shot gun, watched deceased approach until within range]; in all of which cases, the evidence was held sufficient to support a finding of premeditation.

*Judgment affirmed.*