613 A.2d 956

Neal Frederick WILLEY, III

v.

STATE of Maryland.

No. 149, Sept. Term, 1991.

Court of Appeals of Maryland.

Oct. 13, 1992.

Julia Doyle Bernhardt, Asst. Public Defender (Stephen E. Harris, Public Defender, both on brief), Baltimore, for petitioner.

Cathleen C. Brockmeyer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

CHASANOW, Judge.

Neal Frederick Willey III was charged with first degree murder and related offenses in the death of Venus Ann Shifflett and tried by jury in the Circuit Court for Baltimore County, the Honorable John Grason Turnbull II presiding. The jury found Willey guilty of first degree murder and use of a handgun in the commission of a felony. The court then imposed a sentence of life imprisonment for murder and a twenty-year consecutive sentence for the handgun conviction.

Willey appealed his convictions to the Court of Special Appeals arguing, among other things, that the trial court did not adequately distinguish first degree murder from second degree murder in its instructions to the jury. The intermediate appellate court affirmed the lower court's judgment in an unreported opinion holding that the instruction given adequately reflected the essential distinction between the two degrees of murder. Willey petitioned this Court based on the adequacy of the jury instruction and we granted certiorari. We also affirm the judgment.

The parties have submitted an agreed statement of facts pursuant to Maryland Rule 8–501(g). The following rendition of the events underlying Willey's conviction is drawn largely from that submitted statement.

Neal Willey and Venus Shifflett had lived together but separated in the fall of 1988 shortly after the birth of their daughter, Brittany. During the separation, Willey enjoyed liberal visitation with Brittany, seeing her nearly every day. In July of 1989, however, Willey took Brittany away from her mother's home without permission on two occasions, each for a number of days. Thereafter, Ms. Shifflett forbade further visitation.

Willey testified that he did not have access to Brittany after July 19, 1989. The following week he was admitted to a hospital because he was depressed and suicidal. When he was released thirteen days later, he learned that his employment had been terminated and that Ms. Shifflett had become involved with another man, Jeff Williams.

Willey's longtime friend and former roommate, Harvey Leichling, testified that Brittany "was [Willey's] world" and that, by the onset of summer, Willey's behavior had become increasingly erratic. Leichling also testified that in July of 1989, he had found black clothing and a black ski mask in Willey's bedroom. When Leichling asked about the black attire, Willey told his friend that if Ms. Shifflett continued

to press assault charges against Willey [1], he was going to stand in the woods, by the Baltimore–Washington Parkway, behind Shifflett's home and shoot her. Willey denied that he ever told Leichling that he had assembled an outfit of black clothing to wear while shooting Ms. Shifflett. Willey, however, admitted that he had made threats to kill Venus Shifflett and that he had told the doctors at the hospital as well as Venus' friends of the threats. The State also adduced from other witnesses evidence that Willey had threatened Ms. Shifflett.

On August 27, 1989, Willey called Ms. Shifflett from a pay phone on the Baltimore–Washington Parkway. Willey apparently was hoping to see Brittany because he had heard from a friend the day before that Ms. Shifflett might agree to supervised visitation. After having told Willey that she did not want to talk to him, Ms. Shifflett reported to her mother that Willey had threatened to kill her and she immediately contacted the police. Following his phone call, Willey drove farther down the Baltimore–Washington Parkway and parked his car on the side of the parkway behind Ms. Shifflett's backyard. Willey got out of the car, loaded gun in hand, and headed toward the house. He looked in the window and saw Ms. Shifflett, Brittany, and other family members. Willey recounted these events to the jury:

"I looked at Brittany and she had, her hair had gotten longer and darker, she was walking around a lot better. I missed Brittany. It was the first time I had seen her in over six weeks. As I was watching Brittany, I then looked at Venus and trying to ask myself, why is she trying to keep Brittany away from me. I have done everything in this world I could possibly do to try to help our daughter, to see that she's provided for, to see that she'll be taken care of later on. As I was looking and

---

1. The assault charges sprang from an April, 1989 incident. At his murder trial, Willey admitted that he had gone to Ms. Shifflett's workplace in April and gotten into an argument with her during which he struck her several times giving her a black eye and other head injuries.

looked at Venus and looked back at Brittany, Jeff Williams walked into the door and I could see him enter the doorway.  At that moment, I knew that Venus had no plans for me to be Brittany's father or to be in Brittany's life.  I looked at Brittany and I looked at Venus and I couldn't see why, why she was doing this, why she was keeping Brittany away.  And at that time I had a gun on me, I brought it from the car, it was under my seat, when I stopped the vehicle, the gun slid out from under the seat.  It was laying there loose and it was loaded.  I start[ed] getting out of the car and then remembering that if I got anywhere near the house, that I had been told I was going to be shot.  So I took the gun with me.  I didn't know what I wanted to do.  I just wanted to see Brittany.  There was no intention to hurt anyone.  After I got up to the house and saw Brittany, then I saw Venus and I saw Jeff walk in the door, and Venus had decided to keep me out and keep me away from Brittany, I pointed the gun at Venus and I had seen Brittany still walking in the room, and then without looking at Venus, I thought about Jeff being the daddy of my little girl and the gun went off.  When the gun went off, my eyes didn't focus on anything but the glass breaking in front of me.  I then turned and ran.  I didn't know if I hit Venus or what, what happened.  I turned and ran."

Willey shot one bullet through the living room window of Shifflett's house.  Willey testified that he was a marksman in the military and that he pointed the gun first at Ms. Shifflett's midsection and then aimed at her head.  Ms. Shifflett died of a single gunshot to the temple.

Willey had a number of witnesses at the trial testify to his emotional instability during the month preceding the murder.  Among them was his sister, who described Willey as "overly happy" when Brittany was born and extremely depressed after being denied visitation.  During the week before Ms. Shifflett's death, Willey's sister became convinced that he needed "a doctor, he needed some kind of help" and she sent for their father, who lived in Florida.

Finally, she described Willey as having been upset and depressed on the day he killed Ms. Shifflett. After Willey's arrest, he told a police officer that he had tried to talk to Ms. Shifflett on the evening of her death and that when she would not talk to him he "just lost it."

Willey now argues to this Court that his conviction for first degree murder should be reversed because the trial court did not adequately instruct the jury as to the difference between first and second degree murder. The trial court gave the following instruction, which is contained in the Maryland Pattern Jury Instructions: [2]

"The defendant is charged with the crime of murder. This charge, as I have indicated, includes first degree murder and second degree murder. First degree murder is defined as the intentional killing of another person with wilfulness, deliberation and premeditation.

In order to convict the defendant of first degree murder, the State must prove (1) that the conduct of the defendant caused the death of Venus Ann Shifflett, and (2) that the killing was wilful, deliberate and premeditated.

Wilful means the defendant actually intended to kill the victim. Deliberate means the defendant was conscious of the intent to kill. Premeditated means that the defendant thought about the killing and that there was time, though it need only have been brief, for the defendant to form the intent to kill. The premeditated intent to kill must be formed before the killing.

Second degree murder is the killing of another person with either the intent to kill or the intent to inflict such serious bodily harm that death would be the likely result. Second degree murder does not require premeditation or deliberation. In order to convict the defendant of second degree murder, the State must prove, (1) that the conduct of the defendant caused the death of Venus Ann Shifflett

---

**2.** *See* Maryland Pattern Jury Instructions—Criminal 4:17 (1986).

and, (2) that the defendant engaged in the deadly conduct either with the intent to kill or with the intent to inflict serious bodily harm that death would be the likely result."

The instruction clearly conveys that one difference between first and second degree murder is that a defendant may be convicted of the latter absent an intent to kill. Willey focuses his attack on a narrower distinction, however, arguing that the instruction failed to point out to the jury any difference between first degree murder and the intent-to-kill variety of second degree murder. Although we will decide the issue raised in Willey's petition for certiorari, we should point out that Willey testified that he did not intend to kill Venus Shifflett. His own account of the shooting did not require the jury to make the distinction between the impulsive versus the reflective intent that he complains the instruction failed to clearly differentiate. Rather than saying that his intent was the product of impulse, he was telling the jury that he did not intend to kill Ms. Shifflett. As such, we cannot see that Willey's testimony raised the subtler distinction between the two degrees of intent-to-kill murder.

Assuming that Willey did place this distinction before the jury, we find the instructions did not constitute reversible error. Willey complains that this instruction "which stated merely that 'premeditated' and 'deliberate' meant that [Willey] thought long enough to form the intent to kill and was conscious of doing so, failed to convey the essence of first degree murder as it has been defined by this Court in its prior cases." We believe it necessary, therefore, to review some of those cases in which this Court has addressed the requisite mental state for first degree murder.

This Court has repeatedly stated that "the principles of law applicable to determining when a murder is deliberate and premeditated are well settled...." *Colvin v. State*, 299 Md. 88, 108, 472 A.2d 953, 963, *cert. denied*, 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984). *See also Tichnell*

*v. State,* 287 Md. 695, 717, 415 A.2d 830, 842 (1980). The Court in *Tichnell* went on to define first degree murder:

"For a killing to be 'wilful' there must be a specific purpose and intent to kill; to be 'deliberate' there must be a full and conscious knowledge of the purpose to kill; and to be 'premeditated' the design to kill must have preceded the killing by an appreciable length of time, that is, time enough to be deliberate. It is unnecessary that the deliberation or premeditation shall have existed for any particular length of time."

*Id.* at 717–18, 415 A.2d at 842. Thus the essence of first degree murder, as explained by Chief Judge Murphy in *Tichnell,* is that the defendant possess the intent to kill (wilful), that the defendant have conscious knowledge of that intent (deliberate), and that there be time enough for the defendant to deliberate, *i.e.,* time enough to have thought about that intent (premeditate). The instruction given in the instant case closely parallels *Tichnell's* explanation of first degree murder. Willey bemoans the fact that the jury was not told that the design to kill must have preceded the killing by an *appreciable* length of time. Reviewing this Court's past opinions, however, reveals that in analyzing murder cases we have equated an "appreciable length of time" with any amount of time sufficient to convince the trier of fact that the purpose to kill was not "the immediate offspring of rashness and impetuous temper," but was the product of a mind "fully conscious of its own design." *See, e.g., Gladden v. State,* 273 Md. 383, 387, 330 A.2d 176, 178 (1974); *Cummings v. State,* 223 Md. 606, 612, 165 A.2d 886, 888 (1960), *cert. denied,* 366 U.S. 922, 81 S.Ct. 1098, 6 L.Ed.2d 243 (1961). The Court in *Colvin* and *Tichnell,* each citing earlier cases, held that "[i]f the killing results from a *choice made as the result of thought, however short the struggle between the intention and the act,* it is sufficient to characterize the crime as deliberate and premeditated murder." *Colvin,* 299 Md. at 108, 472 A.2d at 963; *Tichnell,* 287 Md. at 718, 415 A.2d at 842 (emphasis added). For other cases using similar language,

see *Wilson v. State*, 261 Md. 551, 565, 276 A.2d 214, 221 (1971); *Hyde v. State*, 228 Md. 209, 215–16, 179 A.2d 421, 423–24 (1962), *cert. denied*, 372 U.S. 945, 83 S.Ct. 938, 9 L.Ed.2d 970 (1963); *Faulcon v. State*, 211 Md. 249, 258, 126 A.2d 858, 863 (1956); *Chisley v. State*, 202 Md. 87, 106, 95 A.2d 577, 586 (1953).

Looking to the application of these principles in our past cases, the Court in *Colvin* noted that "this Court has found sufficient time for reflection and decision where there is an interval between fatal blows or where the assault occurs over a protracted period of time." 299 Md. at 109, 472 A.2d at 963. In *Colvin*, the Court held that "the time during which [Colvin] carried the knife from the kitchen to the stairway, compounded by the protracted nature of the assault, was sufficient time for him to have chosen, after thought and deliberation, to kill." 299 Md. at 110, 472 A.2d at 964. *See also Taylor v. State*, 226 Md. 561, 174 A.2d 573 (1961) (time for defendant to carry weapon from one room to another sufficient for premeditation and deliberation). Likewise, in *Robinson v. State*, 249 Md. 200, 209, 238 A.2d 875, 881, *cert. denied*, 393 U.S. 928, 89 S.Ct. 259, 21 L.Ed.2d 265 (1968), and *Kier v. State*, 216 Md. 513, 522–23, 140 A.2d 896, 900 (1958), the Court found, respectively, that there was an "abundance of evidence" and that it was "irresistibly driven" to conclude that the time during which the defendant repeatedly struck the victim was sufficient to support a finding of premeditation and deliberation. Finally, in *Wilson, Cummings,* and *Chisley,* this Court held that the delay between firing a first and a second shot was enough time for reflection and decision to justify a finding of premeditation and deliberation. See *Tichnell*, 287 Md. at 719–20, 415 A.2d at 843, and *Gladden*, 273 Md. at 387, 330 A.2d at 179, each citing this trilogy of cases for the above proposition.

This definition and application of the "wilful, deliberate, and premeditated" terminology has been carried forward in our most recent cases. In *Ferrell v. State*, 304 Md. 679, 684, 500 A.2d 1050, 1053 (1985), we held that "[t]he period

during which Ferrell was drawing, aiming, and firing his handgun at Copeland, and then aiming and firing at Young was sufficient for premeditation in the murder of Young." The Court found that Ferrell himself "furnished proof that there was an appreciable length of time ... during which the deliberation element of first-degree murder was satisfied" by "having testified to his own mental processes in *consciously deciding* to take the lives of Copeland and Young...." *Id.* at 685, 500 A.2d at 1053 (emphasis added). Thus, the Court held that the short period during which Ferrell shifted his aim from one victim to another provided sufficient time for premeditation as that time period allowed the defendant to deliberate, *i.e.*, to consciously decide to kill.

The Court also recently upheld an instruction that informed the jurors that they "may consider the multiple injuries and their intensity suffered by the victim as providing adequate evidence of premeditation." *Booth v. State,* 306 Md. 172, 190–91, 507 A.2d 1098, 1107 (1986), *vacated on other grounds,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). The Court in *Booth* cited the litany of our past cases to support the proposition that "[t]he intervals between the stab wounds inflicted on [the victim] evidence sufficient time for reflection and decision." *Id.* at 191, 507 A.2d at 1108.

While each of the above cited cases describes the requisite time for premeditation as "appreciable," the crux of the issue of premeditation and deliberation was not the particular time involved but whether the intent to kill was the product of a conscious decision as opposed to an impulsive or almost instinctive reaction. The mental state for first degree murder has been described in a similar fashion by other courts and commentators.

In a treatise on homicide, F. Lee Bailey and Henry B. Rothblatt addressed the time necessary to allow for deliberation:

"A very brief period will suffice, provided the formed intent to kill was *consciously conceived* in the mind of the slayer before the homicidal act was committed. It is

sufficient that with the intention to commit the act the appreciation of the result likely to follow appeared to the defendant at the time the act was committed, or that he understood and contemplated the consequences of his act. The requisite design may exist for only an instant before the commission of the crime.

\* \* \* \* \* \*

*If the killing is not the instant effect of impulse, if there is hesitation or doubt to overcome and a choice made as the result of thought,* however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder." (Emphasis added, footnotes omitted).

F. Bailey & H. Rothblatt, *Crimes of Violence: Homicide and Assault* § 550, at 432 (1973). *See also Fields v. State,* 280 Ark. 153, 655 S.W.2d 419, 421 (1983) (premeditation defined as the "conscious object to cause death ... a weighing in the mind of the consequences of a course of conduct as distinguished from acting upon sudden impulse without the exercise of reasoning powers"); *State v. Marston,* 479 S.W.2d 481, 484 (Mo.1972) (premeditation means "the defendant thought about what he was about to do before he did it").

The Maryland Criminal Pattern Jury Instruction given in the instant case explained to the jury that in order to be convicted of first degree murder Willey must have "thought about the killing" and have been "conscious of the intent to kill." We see the instruction as encapsulating first degree murder as expounded by this Court and, consequently, we reject Willey's contention that the instruction "failed to convey the essence of first degree murder as defined by this Court." Further, we note that this Court recently cited with approval the Maryland Pattern Jury Instructions "[f]or the meaning of 'wilful,' 'deliberate,' and 'premeditated.' " *Hook v. State,* 315 Md. 25, 30 n. 7, 553 A.2d 233, 235 n. 7 (1989).

As we have stated in the past, "We are cognizant of the importance of *stare decisis* and the resulting certainty, definition, and dependability it gives the law." *B & K Rentals v. Universal Leaf,* 324 Md. 147, 158, 596 A.2d 640, 645 (1991). *See also Gillespie v. State,* 147 Md. 45, 59-60, 127 A. 727, 732 (1924). We find that the instruction given is not out of sync with our wealth of caselaw on premeditation and deliberation, and paying deference to those cases, we find no reversible error in giving the instruction.

■ Beyond this approval, we point out that we do not believe that the jury misapplied the instruction in the instant case. We reiterate that given Willey's assertion that he had no intent to kill Ms. Shifflett, we fail to see that Willey asked the jury to differentiate between an impulsive and a reflective intent to kill.

Further, we believe that the jury applied the instruction to distinguish between the two forms of intentional murder. The jurors were told by Willey's friend, Harvey Leichling, that Willey had described the exact manner in which he would kill Ms. Shifflett—shooting her from the woods off the BW Parkway—a couple weeks before he carried out the plan. The jurors also heard from other sources, including Willey himself, that he had repeatedly threatened Ms. Shifflett. The evidence certainly provided a strong basis upon which the jury could have found that Willey had, weeks in advance, contemplated killing Ms. Shifflett and planned the logistics of achieving that end.

The jurors were also told that some five to ten minutes before Ms. Shifflett was shot Willey had called her from a pay phone on the parkway and had threatened to kill her—a threat that so troubled Ms. Shifflett, she immediately contacted the police. Willey admitted to the jury that he was a marksman in the military, and after aiming the gun at Ms. Shifflett's midsection he shifted his aim to her head and pulled the trigger. Given Willey's contemplated and articulated intent to kill Ms. Shifflett followed by his actions which achieved that end, the jurors were really deciding

whether the gun went off without any conscious intent as Willey maintained or whether Willey was acting on his articulated intent to kill Ms. Shifflett.

■ Although we hold the instruction was not erroneous, it should be amplified. We acknowledge that some of our cases upon which this instruction may have been based have virtually obliterated the fine and often difficult distinction between first degree murder and the intent-to-kill variety of second degree murder. We believe that it would be preferable, especially where the distinction is clearly at issue, for the trial court to emphasize that in order for the jury to conclude that the defendant premeditated the killing it must find that the defendant had sufficient time to consider the decision whether or not to kill and weigh the reasons for or against such a choice. Movement in this direction would be consistent with the developing trend of courts and commentators to focus more attention upon, and more clearly define, the distinct mental states involved in first versus second degree murder. One prominent commentator summarized the evolving nature of first degree murder:

> "It is often said that premeditation and deliberation require only a 'brief moment of thought' or a 'matter of seconds,' and convictions for first degree murder have frequently been affirmed where such short periods of time were involved. *The better view, however, is that to 'speak of premeditation and deliberation which are instantaneous, or which take no appreciable time, * * * destroys the statutory distinction between first and second degree murder,' and* (in much the same way that the felony-murder rule is being increasingly limited) *this view is growing in popularity.*" (Emphasis added, footnotes omitted).

2 W. LaFave & A. Scott, Jr., *Substantive Criminal Law* § 7.7, at 237 (1986).

Other states with statutory schemes similar to Maryland's have been the subject of academic scrutiny. In a thoughtful article, one author explained that "[o]nly deliber-

ation, in the sense that it means a mental process that involves careful thought and weighing of the facts and consequences, connotes a concept that is not necessarily included in the notion of intent. Intentional conduct may be the product of deliberation or it may be quite impulsive." Leo M. Romero, *A Critique of the Willful, Deliberate, and Premeditated Formula For Distinguishing Between First and Second Degree Murder in New Mexico,* 18 N.M.L.Rev. 73, 83 (1988). Reviewing New Mexico murder law, the author went on to lament that the "courts have done little to explicate the difference between a deliberate and impulsive killing notwithstanding the significant difference in punishment between the two types of intentional murder." *Id.* at 84. The author noted that the New Mexico Uniform Jury Instruction "eliminates time as a relevant factor in determining whether an intentional killing is deliberate" as it states that a "calculated judgment and decision may be arrived at in a short period of time." *Id.* at 86. The author argued,

"Although time should not be a determining factor for deciding whether an intentional homicide is deliberate, time should not be irrelevant to the decision. The thought processes described in the definition of deliberate intention would seem to require some time. To engage in careful thought and to weigh the considerations for and against the proposed course of action that might result in a killing must involve the passage of time; otherwise, the formation of the intent to kill would be impulsive and rash." (Footnotes omitted).

*Id.* at 86–87.[3] *See also* M. Patricia Walther, *Should Virginia Put the Planning Back Into the Premeditation Re-*

---

**3.** In this article, the author noted that the New Mexico Uniform Jury Instruction which defines deliberate intent states, "A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill." Leo M. Romero, *A Critique of the Willful, Deliberate, and Premeditated Formula for Distinguishing Between First and Second Degree Murder in New Mexico,* 18 N.M.L.Rev. 73, 88 (1988). He commented that "[a]lthough the definition of

*quired for Murder?*, 40 Wash. & Lee L.Rev. 341 (1983) (arguing that Virginia should make further effort to distinguish premeditation from intent to kill); *United States v. Chagra*, 638 F.Supp. 1389, 1400 (W.D.Tex.), *aff'd*, 807 F.2d 398 (5th Cir.1986), *cert. denied*, 484 U.S. 832, 108 S.Ct. 106, 98 L.Ed.2d 66 (1987) ("the trend in the decisions has clearly been towards recognizing the clear legislative intent to distinguish between a cool and reflective mind that did reflect before the killing, as required by first degree murder, and the more impulsive, yet still intentional, state of mind that characterizes second degree murder").

Perhaps mindful of this trend, this Court has recently elaborated on the requisite mental state for first degree murder. The Court in *Ferrell v. State*, 304 Md. at 685, 500 A.2d at 1053, applied our prior cases and held that Ferrell himself furnished proof that there was time enough to deliberate by "having testified to his own mental processes in *consciously deciding* to take the lives of Copeland and Young...." (Emphasis added). While the Court upheld and applied the principles embodied in our long line of

deliberate intent in the uniform Jury Instructions for Criminal Cases appears to distinguish between deliberate and impulsive or rash killings, the courts have provided little guidance about the evidence sufficient to place an intentional homicide on one side or the other of the 'deliberate' line." *Id.* at 85–86. He suggested, however, that the courts' reluctance to reduce intentional killings from first to second degree murder reflects the judgment that deliberation does not always identify the most heinous murders and that the "suddenness of the killing may simply reveal callousness so complete and depravity so extreme that no hesitation is required." *Id.* at 92–93 (quoting American Law Institute, *Model Penal Code and Commentaries* 127 (Part II 1980)). This Court's decision in *Chisley v. State*, 202 Md. 87, 106, 95 A.2d 577, 585–86 (1953) is a perfect example of that judicial judgment. The Court held that Chisley, who shot a man because the latter said that a pack of cigarettes did not belong to Chisley, had premeditated the murder in between gunshots. Surely, the Court in *Chisley* believed that the defendant's sheer depravity—and not the careful weighing of his decision to kill—justified the first degree murder conviction.

The author of the article concludes that the real "solution requires the legislature to eliminate the deliberation formula for distinguishing between first and second degree murder" and "specify the particular circumstances that make some intentional homicides especially grievous." Romero, *supra*, at 92–93, 95 A.2d 577.

cases, we suggested that the Court's tendency to minimize the time required for premeditation might be reconsidered. Judge Rodowsky, writing for the Court, noted that

"Professor Perkins goes so far as to say that '[t]he notion that a fully formed intent is always deliberate and premeditated, no matter how short the time between the first thought of the matter and the execution of the plan, is preposterous.'"

*Id.* at 688, 500 A.2d at 1055 (quoting Perkins, *The Law of Homicide*, 36 J.Crim.L. & Criminology 391, 449 (1946)). As in *Ferrell*, we do not cast off the moorings of established law but we acknowledge that the judiciary would do well to clarify, rather than minimize, the existing distinctions between Maryland's two degrees of intent-to-kill murder.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY APPELLANT.

McAULIFFE, J., concurs in the result only.

ROBERT M. BELL, Judge, concurs:

I join in the result only. In my opinion, based on the facts of the case, I would not reach the instruction issue. If I were to reach the issue, I would reverse.