622 A.2d 145

**Robert Patrick LIPINSKI**

v.

**STATE of Maryland.**

**No. 583, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

March 31, 1993.

Mark Colvin, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Sandra A. O'Connor, State's Atty. for Baltimore County, Towson, on the brief), for appellee.

Argued before GARRITY, ALPERT and DAVIS, JJ.

GARRITY, Judge.

The appellant, Robert Patrick Lipinski, was convicted of first degree murder in a non-jury trial in the Circuit Court for Baltimore County and sentenced to life imprisonment. In addition, the court clerk entered "without parole for at least 25 years." We are asked to consider whether the trial court was clearly erroneous in finding appellant guilty of first degree murder and whether the sentence imposed was legal.

## BACKGROUND

On June 2, 1991, the body of Gina Courtalis, an employee at the Nutri–System Weight Loss Center, was found in the firm's office in Towson. Based on statements made by the appellant and evidence gathered at the crime scene, the following facts are known concerning her death.

The victim's body was discovered early on June 2, 1991, lying in a pool of blood in a file room at the end of a long hallway leading from the reception area. She had multiple stab wounds to her chest and back. There was evidence of a struggle: blood was found under fingernails on both of the victim's hands, there were blood splatters on the walls, blood was found above the doorknob of the door leading into the file room, and picture frames had come off the wall and were found with the broken glass underneath and next to the victim. There was no evidence of theft or sexual assault.

An autopsy revealed that the victim had been stabbed twice in the chest and ten times in the back. The stab wounds in the chest penetrated the soft tissue but did not enter the chest cavity. The stab wounds inflicted on the middle left portion of the victim's back were far more serious and led to the medical examiner opining, because of the clustering orientation of the wounds, that the deceased was probably stabbed in the front of the chest, collapsed and then stabbed in the back. The medical examiner concluded that the type of back wounds inflicted indicated a lack of struggle on the part of the victim, that the clustering of the wounds indicated violence or rage, and that the wounds were inflicted one after another in rapid succession.

Investigators quickly focused on appellant since, as an employee of a cleaning service, he had been present in the office on June 1, 1991. When interviewed by police, it was evident that the appellant had recently sustained cuts and abrasions on his face, hands, and legs that were consistent with a struggle, and his shoe contained a blood splatter consistent with that of a bloody footprint found at the crime scene.

Appellant eventually gave police a number of statements concerning the events leading to the stabbing of Ms. Courtalis. In a written statement, he recounted the following events leading up to the stabbing:

> I arrived at Towson Nutri System at about 2:00 p.m. on Sat., June 1, 1991. I got my cleaning equipment out of

my car and went to the door which was locked. The girl inside opened the door and told me they were closed. I told her I was the cleaner and this was my normal day to clean the center. She asked me in a bitchy tone of voice how long I would be, and I told her it wouldn't take me long. After she finally let me in, I started by cleaning the bathrooms. I cleaned the toilets and mirrors, and wiped the sinks off. Next, I emptied the trash cans in the offices and behind the front counter. Next, I started vacuuming. While vacuuming, I noticed something stuck on the carpet that the vacuum wasn't picking up, so I got a broom out of the file room to try to break it up so that I could vacuum it up. During this time, the girl asked me how much longer I would be. She seemed to be in a hurry to get out of there. I told her I would be finished shortly. I went back to vacuuming and finished vacuuming the lobby area. When I finished, she said that was fast. I said I told you it wouldn't take me long. I then went back through the center to see if I had missed anything or left any of my equipment behind. At this time I was coming back up the hallway. She was coming down, and she bitched at me saying are you done yet. I said yes, and she said good because I want to get out of here and gave me a real dirty look, as if to say it's your fault I had to stay later anyway.

I had been under a lot of pressure lately working long odd hours to support by family, looking for a new place to live after our landlord advised us they were not going to renew our lease due to a family crisis. I just didn't have enough time in each day to do everything I had to do. I was in just as much of a hurry to get out of there as she was. By this time, I was tired from lack of sleep and worrying about where me and my family were going to live. With everything that was going on I was tired of it. All her bitching at me to get done didn't help. At this point I just couldn't take it any more. I just snapped. I had put a butterfly knife in my left pocket earlier that day. It was left in my car by a friend of mine, George

Barton. After she bitched at me the last time in the hallway I snapped and grabbed her by the arm and for some unknown reason pulled the knife out of my pocket and stabbed her a few more times. Exactly how many I don't know. We bumped into the wall knocking down some picture frames. She then dropped to the floor. I didn't know if she was still alive or not. I didn't mean for this to happen. I just hit a breaking point. After she dropped to the floor I tore the phone lines off the wall. Then I went into the bathroom and cleaned some blood off my hands with paper towels, which I put in the bucket I keep my cleaning supplies in, and took the bucket and my vacuum cleaner to my car. I then left the Nutri System at about 2:30 p.m. and went straight home.

At trial, several witnesses testified to appellant's peaceful nature. He is 27 years of age, a high school graduate, and is married with three children. Prior to this event, he had no criminal record.

Expounding on his confession, Appellant testified at trial that he had arrived at the Nutri–System office just before 2:00 p.m. and was allowed in by Ms. Courtalis. He advised the trial judge that he had not known the victim nor did he recall ever having seen her before. After he started to clean the office she asked how long he was going to take. She seemed in a hurry to leave and asked how long he was going to take. The appellant further testified that at about 2:30, as he was finishing up and getting ready to leave, Ms. Courtalis came down the hallway and asked in a "bitchy" tone of voice if he were finished. He answered that he was just about finished. She said that she was in a hurry and kept "pestering me on saying the same thing." At this point, the appellant testified that he "couldn't take any more" and said, "Bitch, I will be done in a minute, you can go. I want to go home too." He stated that Ms. Courtalis then slapped him and her fingernail dug into the side of his

face.[1]  He then called her "bitch" a second time, and when she in turn tried to slap him again, he grabbed her arm.  He described what then took place as follows:

Q.  Then what happened?

A.  I pulled her and I slammed her into the wall.  I just got infuriated.  I, you know, just got to a point where I was tired.  I was over-stressed.  I just couldn't take it any more.  And I just got into an actual fight with her.

Q.  When you say a fight with her, what was she doing at that time?

A.  Well, after we—I slammed her into the wall, she struck back at me.  And then I struck at her and then it just went back and forth, you know, and we grabbed each other and threw each other into the wall.

\* \* \* \* \* \*

Q.  Mr. Lipinski, sometime during the course of that affray, you pulled out George Barton's knife;  is that correct?

A.  Evidently that is correct.  As far as actually taking it out of my pocket I do not recall doing it.

Q.  Do you recall stabbing her?

A.  I recall a stabbing motion, yes.

Q.  How many times do you recall stabbing her, Mr. Lipinski?

A.  I don't recall total number.  One, maybe two or three, it's hard to say.  At this point, I was just in a fury.

Q.  You indicated to the Detective Peregoy you just snapped?

A.  I would call it that, yes.

Q.  Have you ever snapped before in your life?

A.  No, I haven't.  Of course, I never been under such circumstances either.

Q.  What circumstances?

---

1.  A photograph taken of the appellant's face at the time of arrest depicts a wound consistent with his description.

A. With having to move and money problems and, you know, overworked, not much sleep. I had been having severe headaches at times.

Q. You don't recall how many times—

A. No, I don't.

Q. —the stabbing motion took place?

A. No, I do not.

Q. Do you recall how the picture frames got on the floor?

A. They were, from what I can remember, behind the door and when we slammed into the door they fell off the wall.

Q. Do you recall where Miss Courtalis was standing or where Miss Courtalis was when she was stabbed?

A. It was in the middle of the file room basically, or semi half-way back through the file room.

Q. Was she standing?

A. She, yes, she was standing.

Q. Do you ever recall stabbing her when she was on the floor?

A. No, I do not.

Q. Do you recall when you stopped stabbing her or making the stabbing motion?

A. Not really. I recall her hitting the floor and that's the last thing I can recall and me running out of the building.

The appellant further stated that he "cannot to this day believe that I could do something like that", and that "it just got to the point where I didn't realize what I was doing."

## DISCUSSION OF LAW

The Appellant contends that the court was clearly erroneous in finding him guilty of first degree murder because the trial judge employed an incorrect legal standard in determining whether the killing was premeditated. The standard used by the trial judge, according to the appellant, was

"that a killing is premeditated and deliberate if there is a specific intent to kill and the decision to kill is made before the killing—even if that decision is made 'in an instant' or 'less than a second.'" The appellant also avers that the facts were insufficient to sustain a conviction for first degree murder. In addition, the appellant argues that the sentence imposed was illegal.

### 1. *Standard*

In *Willey v. State,* 328 Md. 126, 613 A.2d 956 (1992), the Court of Appeals explicated the distinction between first degree murder and the intent to kill character of second degree murder. Writing on behalf of the Court, Judge Chasanow observed:

> We acknowledge that some of our cases upon which this instruction may have been based have virtually obliterated the fine and often difficult distinction between first degree murder and the intent-to-kill variety of second degree murder. We believe that it would be preferable, especially where the distinction is clearly at issue, *for the trial court to emphasize that in order for the jury to conclude that the defendant premeditated the killing it must find that the defendant had sufficient time to consider the decision whether or not to kill and weigh the reasons for or against such a choice.* Movement in this direction would be consistent with the developing trend of courts and commentators to focus more attention upon, and more clearly define, the distinct mental states involved in first versus second degree murder. (Emphasis added).

*Id.* at 138, 613 A.2d 956.

The Court of Appeals went on to quote with approval the following passage from 2 W. LaFave & Scott, Jr., *Substantive Criminal Law* § 7.7 at 237:

> "It is often said that premeditation and deliberation require only a 'brief moment of thought' or a 'matter of seconds,' and convictions for first degree murder have frequently been affirmed where such short periods of

time were involved. *The better view, however, is that to 'speak of premeditation and deliberation which are instantaneous, or which take no appreciable time, ... destroys the statutory distinction between first and second degree murder,' and* (in much the same way that the felony-murder rule is being increasingly limited) *this view is growing in popularity."* (Footnotes omitted). *Id.* at 138, 613 A.2d 956.

In announcing the verdict, the trial judge, in the matter at bar, discussed at some length the elements of the crime of murder and the difference between first and second degree. He stated:

The difference between first degree murder and second degree murder is that in first degree murder the perpetrator decides to kill and after making the decision to kill, in fact, carries out the act. In fact, in *Smith [v. State,* 41 Md.App. 277, 398 A.2d 426 (1979)] the Court says, we don't think the word premeditated today means, of necessity, anything more than having made the choice to kill, a notion already conveyed by the specific intent to kill itself, and conveyed even beyond theoretical argument by the addition of the adjective deliberate.

The question in this case is, is there evidence that this killing was willful, intentional and deliberate. And we can add the word premeditated, as that means willful and deliberate and with fully formed purpose before the killing.

\*  \*  \*  \*  \*  \*

Most lay people think when you talk about premeditation, that one sat and thought and contemplated and decided and then went out and did an act based on that thought and decision. There have been a number of Maryland cases that say that there is premeditation that occurs in an instant, literally an instant. It's whether the decision to kill has been made before the killing.

There are cases that talk about that decision being formed literally in an instant. In less than a second. One thought following the other ...

■ We believe that, in finding appellant guilty of first degree murder, the trial court blurred the distinction between first and second degree murder, and, in so doing, erred. It is evident that the trial judge relied on our discussion in *Smith v. State,* 41 Md.App. 277, 398 A.2d 426 (1979).[2] The language employed in *Smith,* however, is inconsistent with the pronouncements in *Willey,* wherein the Court of Appeals stressed that a conclusion that the killing was premeditated, especially where the distinction between first degree murder and the intent to kill variety of second degree murder is clearly at issue, as in the case at bar, must be based on findings "that the defendant had sufficient time to consider the decision whether or not to kill and weigh the reasons for or against such a choice."

In light of the court's reliance on *Smith,* we shall remand this matter to allow the trial judge to consider the evidence in accordance with the standard enunciated by the Court of Appeals in *Willey v. State, supra,* as to whether the appellant acted with premeditation and deliberation.

## 2. *Sentencing*

■ In the event the trial court maintains the present verdict under the *Willey* test, we shall examine the sentence that was imposed.

Although the State moved the court to sentence the appellant to life imprisonment without the possibility of parole in accordance with Md.Code, art. 27, §§ 412 and 413, the court denied the motion. In refusing to sentence the appellant to life without parole, the trial judge observed:

The second part, the individual who I sentence. I can tell you that Mr. Lipinski is not, at least from my experi-

---

2. We must note that the Court of Appeals decided the *Willey* case on October 13, 1992, almost nine months after the trial court rendered its verdict in this matter.

ence, the typical first degree murderer. He is not. He presents as someone who has no record whatsoever, has never been in trouble as a juvenile. Has no juvenile convictions. He has no adult convictions. He worked. He had a family. He supported his family. He had no trouble with the law. In that sense he is not typical, at least, of the kinds of murderers that I think we typically see with so horrible and brutal a case as this one.

\* \* \* \* \* \*

The law says that he can't get out of prison again *regardless of whatever sentence I give him* for a minimum of 25 years. That's a minimum. (Emphasis added).

\* \* \* \* \* \*

... Should this court, can I under the law impose a sentence of life without parole, given Mr. Lipinski's background? I think if I did I would be breaking the law as it exists today.

\* \* \* \* \* \*

Mr. Lipinski, stand up. The sentence of the court is that you are committed to the Division of Correction for the balance of your natural life.

The commitment record states: "Sentence imposed pursuant to Article 27, Section *413*. Defendant uneligible [sic] for Parole until 25 years are served." (Emphasis added).

The appellant asseverates that the commitment record stating that he is ineligible for parole until 25 years have been served is improper. We agree.

The State notified the appellant that it would seek punishment under Md.Code, art. 27, §§ 412 and 413. Pursuant to section 412, upon which the appellant was actually sentenced, rather than the noted "413" (which pertains to the sentencing procedure before a specially impaneled jury in a case wherein capital punishment has been sought), "a person found guilty of murder in the first degree shall be sentenced to death, imprisonment for life, or imprisonment for life without the possibility of parole."

Under a sentence of life, in accordance with Md.Code art. 41, § 4–516(c)(1), "a person who has been sentenced to life imprisonment is not eligible for parole consideration until the person has served 15 years or the equal of 15 years when considering the allowances for diminution of period of confinement provided for in Article 27, § 700 and Article 27, § 638C, of the Code." [3]

Thus, the trial court shall correct the sentence in accordance with this opinion.

JUDGMENT VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION.

COSTS TO BE PAID BY BALTIMORE COUNTY.

---

**3.**  A person who has been sentenced to life imprisonment as a result of a proceeding under Article 27, § 413, wherein the State seeks capital punishment before a jury, is not eligible for parole consideration until the person has served 25 years or its equivalent when considering allowances for diminution.

A person sentenced to imprisonment for life without the possibility of parole under Article 27, §§ 412 or 413 of the Code, is not eligible for parole consideration.